IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

Chicago Insurance Company,                    Case No. 1:01CV2588

      Plaintiff

   v.                                            ORDER

James A. Capwill, et al.,

      Defendant

This is a declaratory judgment action between plaintiff Chicago Insurance Company and one of its former insureds, James A. Capwill, whose interest in the policy is presently in the hands of a receiver for two defunct companies, Liberte Capital Group (Liberte) and Alpha Capital Group (Alpha). The receiver seeks to collect on the policy; the company refuses to pay and seeks rescission.

Each party has filed for summary judgment. For the reasons that follow, I grant the insurance company's motion (Doc. 366) and deny the receiver's motion (Doc. 356).

**Background**

As of 1996, Capwill was a Certified Public Accountant running his own small accounting firm. He entered into negotiations with another accountancy firm, Wesley, Mills & Co., to form a

separate company, CWN Group. Though the Wesley, Mills participants did not go forward with CWN, Capwill did.

In addition, Capwill, along with a different Wesley, Mills employee, formed Viatical Escrow Services (VES). VES serviced viatical insurance policies that Liberte and Alpha held for investors. Richard Jamieson, the principal in Liberte and Alpha, and Capwill jointly defrauded the investors of several tens of millions of dollars.

Jamieson's part of the fraud involved arranging for life insurance policies for persons afflicted with AIDS. Jamieson provided financial incentives to individuals to apply for life insurance, but withheld relevant medical information or provided false medical information in exchange for the issuance of a policy. These professional "viators" would then secure multiple insurance policies through this method, described as "clean-sheeting." The policies were then obtained by Jamieson and marketed as an investment opportunity to the public-at-large. Interests in these policies were then sold to investors for a portion of their face value with the promise of a significant return within a given time frame. Jamieson perpetrated a fraud not only upon the various insurance companies, but upon investors by not disclosing the insureds' true life expectancy. The jig was up when Jamieson, through Liberte and Alpha, was unable to meet the returns promised.

The servicing which Capwill, through VES, was to provide included payment of the policy premiums. For that service, he received fees.

Capwill had exclusive control over the funds which he was, through VES, to pay for the policy premiums. At some point, he began using those funds to make investments through another company which he established. Those investments, on the whole, were unwise and unsound.

As policies began to lapse for nonpayment of premiums, Liberte and Alpha sued Capwill in 1998. Liberte and Alpha went into receivership, with its investors having lost tens of millions of dollars from their purchase of fraudulently obtained life insurance policies for which they never received payment on the death of the insured. Following determination of Capwill's defalcations and Jamieson's frauds, they each were indicted. The government successfully prosecuted Jamieson and Capwill. Each remains in prison.

In 1997, Capwill first sought professional liability insurance from the plaintiff through an insurance brokerage firm, Todd Associates, Inc. Todd submitted Capwill's application to the Herbert H. Landy Insurance Agency.

Landy was plaintiff's managing agent for its line of accountant's malpractice insurance. Landy referred the application to plaintiff, which ultimately issued three annual policies covering Capwill, CWN and VES for accountancy professional liability.

To obtain continued coverage, Capwill submitted renewal applications. Each of the applications included the same or similar questions on a variety of topics. The purpose of those questions was to enable the plaintiff to assess the risk, decide whether to provide coverage and appropriately price the premiums.

Plaintiff claims that Capwill's answers to questions on five subjects were deliberately false and fraudulently intended to induce it to issue its policies, namely, questions relating to:

1. Investment activities while the owner of VES;
2. Professional disciplinary actions;
3. Lawsuits and claims;
4. Potential claims; and

   5.  Number of professionals performing accountancy for a covered entity.

According to plaintiff, Capwill gave false answers on each application. In doing so, the company contends, he intended to defraud it into providing coverage which it otherwise would not have covered, or would have priced differently. Capwill's fraudulent intent is the gravamen of plaintiff's demand for rescission.

Landy did not refer the 1998 and 1999 renewal applications to plaintiff.[1]

The parties agree that the insurance policies covered accountancy malpractice. They did not, and could not, in light of the intentional and criminal nature of Capwill's defalcations, cover losses which that misconduct engendered.

The receiver, as successor in interest to Liberte and Alpha, seeks to recover on the 1999 policy *vis-a-vis* losses resulting from alleged negligence in performing accounting for VES during the coverage period. Policies from earlier years are not directly at issue. In addition to asserting that plaintiff is not entitled to rescission, the receiver claims that laches and estoppel/acquiescence/waiver bar the insurer's action.

For the reasons that follow, I find that undisputed or indisputable facts exist with regard to four of the five sets of questions and Capwill's answers. I conclude further that, with regard to three of Capwill's answers, he lied.

With regard, however, to one of those false answers (as to suits in the initial application), I conclude that it did not give rise to a right of rescission *vis-a-vis* the 1999 policy.

---

[1] That Landy did not refer the renewal applications to the plaintiff is, contrary to the receiver's contentions, immaterial. The record is clear, and no rational fact-finder could conclude otherwise, that, had Capwill answered all questions honestly, Landy would have referred the renewal applications to plaintiff. The record establishes that it, in turn, indubitably would have declined to renew the policy.

With regard to the other question – relating to number of professionals in the covered firms – I find that the facts are disputed, so that I cannot presently determine the truthfulness or falsity of those answers.

Capwill's false responses to questions about his investment activities and disciplinary actions suffice, however, to entitle the plaintiff to rescission. No rational fact-finder could conclude otherwise than that Capwill lied with the intent to deceive the plaintiff and induce it to issue the policies.

In addition to challenging the plaintiff's claim for rescission on the basis of Capwill's false answers, the receiver asserts affirmative defenses of laches and estoppel/acquiescence/waiver.

The gravamen of the estoppel/acquiescence/waiver defense is that once the plaintiff became aware of the creation of the receivership and Capwill's apparent role in the events leading to the collapse of Liberte and Alpha, it did not immediately cancel the 1998 policy. It had not done so because the policy entitled Capwill to a ninety-day notice of cancellation. To provide notice for that period, the plaintiff renewed the policy, gave the notice and then cancelled the renewed policy. This, according to the receiver, either estops the plaintiff from recovering or constituted acquiescence in any lies in the renewal application or a waiver of the right to rescind on the basis of those lies.

The gravamen of the receiver's laches defense is that when, on November 1, 2001, plaintiff filed this action for declaratory judgment, it did not include a claim for rescission. Instead, it asserted coverage issues.

Plaintiff did not assert a claim for rescission until April, 2004. In addition to arguing that the delay between the filing of the original and the amended complaint caused him prejudice, the receiver protests how the plaintiff's factual contentions in support of its demand for rescission have

5

expanded during the intervening years. Most principally, he complains about being prejudiced due to the loss of documents and other evidence, including the loss of potential testimony due to faded memories.

I conclude that no rational trier of fact could find for the receiver on either of his defenses.

Accordingly, I grant summary judgment for the plaintiff on its demand for rescission and against the receiver on his affirmative defenses.

## Discussion

### A. Claim for Rescission

When issuing any insurance policy, the insurer must assess the risk of loss under the policy. Miscalculation of the risk of loss and its resulting actuarial implications can lead to either of two consequences: namely, pricing the policy too high, and losing the sale, or pricing it too low and thereby potentially enhancing the risk, in the event of a loss claim, of excessive, and possibly unsustainable payments on the policy.

Proper assessment of the risk depends on the accuracy of answers which the insured provides on the application for the policy. The insured's knowing failure to provide accurate answers renders the policy voidable at the insurer's option: "The law requires the applicant for insurance to disclose fully, completely and truthfully all of the facts deemed material by the insurer, and if he violates the relation any policy issued is voidable at the election of the insurer." *Prudential Ins. Co. v. Carr*, 199 N.E.2d 412, 415 (Ohio Common Pleas 1964).

The elements which the plaintiff must establish to succeed on its claim for rescission are: "(1) that there were actual or implied representations of material matters of fact, (2) that such representations were false, (3) that such representations were made by one party to the other with

knowledge of their falsity, (4) that they were made with intent to mislead the insurer to rely thereon, and (5) that the insurer relied on such representations with a right to rely thereon." *Spriggs v. Martin,* 115 Ohio App. 529 (1961) (Syllabus, ¶ 4).

Simple inaccuracy – which could reflect nothing more than oversight or even unawareness – is not enough: the falsity must relate to a material fact. A fact is "material" where it

> would either induce [the insurer] to decline an insurance altogether, or not to accept it unless at a higher premium. Any fact is material the knowledge or ignorance of which would naturally influence an insurer in making the contract at all or in estimating the degree and character or the risk, or in fixing the rate of insurance.

*American Continental Ins. Co. v. Estate of Gerkens*, 69 Ohio App.3d 697, 703 (1990), (quoting *Mieritz v.Metropolitan Life Ins. Co.*, 8 Ohio N.P. 422, 425, 11 Ohio Dec. 759, 763-4 (1901).

The perspective of the insurer, not the insured, determines the materiality of an answer (and the question to which it relates):

> Where any matter is material to the risk, in the judgment of the insurer, though it may not be in fact material, and the insured, knowing this, makes a false representation as to such matter, it will avoid the policy. By making an inquiry as to any matter, the insurer shows that he deems it to be material, and shows that the answer may induce him to take or refuse the risk; he is, therefore, entitled to a true answer, although other persons may not be able to see how it can affect the risk.

*Hutchins v. Cleveland Mut. Ins. Co.*, 11 Ohio St. 477, 479 (1860).

Thus, whether a matter is material relates to whether the company would have issued the policy had it known the true facts, and thus been able accurately to assess the true risk. *See May v. State Farm Ins. Co.*, 1991 WL 81925, *3 (1991).

The receiver asserts various grounds on which he believes a rational trier of fact could not find the questions and answer material. These amount, in essence, to the contention that the plaintiff

7

would not, as a practical matter and in actuality have altered its decisions had all answers been entirely truthful.

As a reading of the above quotations makes clear, this argument misses the mark. It is not necessary for the fact finder to speculate about what might have happened. To use this as a standard would encourage risk-taking on the part of applicants. At best, when in doubt, they could equivocate and quibble – as the receiver does here – in hopes that even a false answer might not, under the receiver's standard, pass muster. This would foster uncertainty and its step-child litigation, which would beget more uncertainty.

The receiver's argument about materiality is, at bottom, a variant on his contention that none of Capwill's falsehoods mattered because the plaintiff would, in the receiver's view, have issued the policy in any event. The testimony of Diane Cummings, the former (and long since departed) head of underwriting for plaintiff – specifically, she was in charge of the liability program under which plaintiff issued the policies to Capwill – puts the lie to this contention. According to Cummings, who also drafted the program's underwriting guidelines, had the plaintiff known the true facts through truthful answers, it would not have issued the policies.

The receiver fails to refute the testimony, and no rational trier of fact would find to the contrary.

Even where the insurer shows falsity as to a material fact, it must also clearly and convincingly show the insured intended to mislead the insurer into issuing a policy that it otherwise would not have issued, had it known the true facts. A trier of fact discerns such intent from the totality of the circumstances. *Klapchar v. Dunbarton Properties, Ltd.*, 1991 WL 249432, \*3 (1991).

As discussed below, there can be no question as to the falsity of at least three of the answers Capwill gave the plaintiff. The fact that he made false statements, not once but several times (as some questions had subparts, which he also lied about), precludes any finding by a rational fact finder other than that it was his deliberate and fraudulent intent to deceive the plaintiff and obtain coverage to which he was not entitled and not likely otherwise to get.

Applying these principles – especially those relating to materiality and fraudulent intent – to four of the questions, I conclude that plaintiff has shown clearly and convincingly that Capwill lied in his answers to the questions, those questions were by their very nature and the circumstances material and Capwill intended to mislead the company into issuing a policy that it otherwise would not have issued but for the false answers.

### 1. Investment Activities

Each application (emphasis supplied) asked:

Has the applicant firm or any partner, officer, *owner*, or employee, within the past policy term:

> a. *Received* commission, fees, reciprocity or *revenue* for sale, promotion or recommendations of investments or tax shelters? yes__ no__
>
> b. Organized, arranged or *procured investments*, real estate or tax shelters? yes__ no__
>
> c. *Participated in* the management of any investment partnership, limited partnership or other *investment venture[s]*? yes__ no__
>
> d. Made recommendations as to the sale or purchase of specific stocks, bonds or other securities? yes__ no__

Capwill answered "No" to each subpart. In doing so, he lied as to (a), (b) and (c).

Most simply and indisputably put: Capwill was the owner of VES, the entity for which he obtained malpractice coverage under the policies. Siphoning funds entrusted to that firm, and over

which he had complete control, he undertook several investments and engaged in investment ventures (*i.e.,* real estate and a restaurant) with the looted funds. He obtained revenue from, at least, loans he made to himself.

The receiver argues that Capwill used a different entity, which the policy did not cover, and which had nothing to do with his accounting practice, to make the investments.

That does not matter: Capwill was the decision maker: it was he who, in fact made the investments with stolen monies through the medium of his separate investment company. No matter how many buffers between himself and where the funds went, it was he – a named insured – who was the actual investor of those funds. His answers to this question were false.

No rational trier of fact could find to the contrary.

The receiver disputes the materiality of these questions and answers. As noted above, that is simply not for anyone but the insurer to decide. If it did not deem the questions material – *i.e.*, pertinent to issuing and pricing the policy – it would be serving no purpose by asking the questions.

In any event, even if the receiver has, in effect, standing to question the materiality of the questions the plaintiff asked of Capwill, his arguments are not persuasive.

The receiver speculates that the purpose of the questions was to ascertain whether Capwill had any involvement in investments that would subject him to undue influence in his accountancy. The speculation has no foundation in the evidence, especially in light of Cummings' testimony that the plaintiff asked the questions to ensure that it was not insuring an investment, rather than an accounting operation.

Thus, even if the receiver had a role in defining materiality, he failed with regard to this question to develop a plausible counter-definition to Cummings' straightforward explanation of why the plaintiff asked about Capwill's investment activities.

## 2. Disciplinary Actions

Each application (emphasis supplied) asked:

During the past year, has any member of the applicant firm:

> a. Had his/her license or *authority* to practice accounting *revoke*d? yes__ no__
> b. Been subject to disciplinary action by any State Board of Accounting, AICPA or State Society? yes__ no__
> c. Been subject to any fine, reprimand or criminal penalty related to performance of professional services? yes__ no__

Capwill answered "No" to each question.

The answer to subpart (a) was false. At the time Capwill filled out the 1998 application, he had received notice that the State had suspended his CPA license for non-payment of a triennial premium. That fact is indisputable.

The receiver points out that filing an appeal, as Capwill, through an attorney, did, allowed him to practice accountancy pending satisfaction of his obligation to pay the premium. The receiver also points out that the General Assembly amended the Revised Code to eliminate the sanction of automatic suspension for nonpayment of the premium.

None of that matters. At the least, from the time Capwill received the notice of suspension until his attorney lodged his appeal, he had no authority to practice accountancy. The suspension revoked that authority, even if only for a relatively short while.

The question was not ambiguous. It was simple and direct: have you had your authority to practice accounting revoked? It did not add: "(Disregard if you now are able to practice

accounting"). Contrary to the receiver's contentions, it was not for Capwill to lie on the basis that he subjectively viewed the suspension as "minor" or "not final."

Even if the receiver had something to say about whether a false answer was material, Cummings' testimony was unequivocal: had plaintiff known about the suspension, it would not have issued the policy.

Revocation of a professional license for whatever reason is a serious matter. Whatever the cause, it is a circumstance of which a professional liability insurer is entitled to an honest answer. Any professional liability insurer would have understandable doubts about the professional competence of an insured who, for whatever reason, and for no matter how briefly, was without his or her license.

That Capwill considered it serious is apparent from the fact he hired an attorney to lodge his appeal and represent him in concurrent disciplinary proceedings by the American Institute of Certified Public Accountants.

No rational fact finder could conclude that this was not a material question. The receiver has, in any event, presented no evidence to refute Cummings' testimony that plaintiff would not have issued the policy had Capwill answered this question truthfully.

### 3. Past Claims

Capwill's initial 1997 application to plaintiff asked:

a. Have any claims or suits been brought against the applicant firm, a predecessor of the firm, or any current or past officer, owner, or employed accountant thereof during the past five (5) years?

b. Having inquired of all partners, officers, owners and employed accountants, are there any circumstances which may result in a claim being made against the firm, its predecessors, or any current or past partner, officer or owner?

Capwill answered "No" to both questions.

This was a false response. Before Capwill filed this first appliation, he had at least ten lawsuits pending against him. The receiver does not dispute that fact.

Instead, receiver claims that the phrase "claims or suits brought against the applicant firm" refers only to "claims" as the policy defines that term. This is not a persuasive argument.

There is nothing in the application to suggest such limitation. The question is, instead, as open-ended as possible: it uses the term "any" and refers to both "claims" and "suits." Nor is there any reason to believe that Capwill, or any other applicant for insurance, would or could have viewed this question in the receiver's limited way.

As the plaintiff points out, Capwill had been involved in ten civil and criminal suits. While the receiver correctly notes that most appear trivial,[2] that does not matter. What matters is Capwill's involvement in those cases. It is for the insurer to evaluate whether, when it comes time to decide whether to issue the policy, and if so, how to price it, anything on the list – or simply the list itself – affects those decisions.

While the clearly false answer in the original application may not have affected the plaintiff's decisions on the renewal applications, it provides additional proof of Capwill's fraudulent intent when he later lied on the renewal applications.

### 4. Potential Claims

The applications for the 1998-99 and 1999-2000 policies asked:

---

[2] Three cases were misdemeanors. Another three involved wage disputes with former employees. One was a rent dispute. The other three were collection actions against Capwill. While the receiver argues, *inter alia*, that none of these actions would have had any bearing on the decisions as to issuing and pricing the policy. he ignores the skeptical view an insurer may have taken toward an accountant who was not paying his bills.

      10. a. Having inquired of all partners, officers and professional employees, are there any circumstances which may result in a claim being made against the firm or its predecessors other than as previously reported? yes__ no__

Capwill answered "No."

The wording of this question differs from the wording of the question about "any claims or suits" in the initial application. While that term was broad and open-ended, the question in the renewal applications asked about "claim being made against the firm." It did not ask about potential suits, or claims against any individual.

I agree with the receiver that five of the lawsuits against Capwill were outside the scope of this question and its reference to claims against the firm. Two of the suits were misdemeanor charges against Capwill and two were forcible entry and detainer actions by his landlord.

A trust brought the fifth suit. The original complaint charged Capwill with fraud and breach of fiduciary duty. An amended complaint dropped the fiduciary duty claim and joined VES.

Though, as amended, the suit included a covered firm, it did not allege negligent accountancy. This is important, as a fair reading of this question is that the term "claim" is, as the receiver argues, limited to claims for which the policies provided coverage. While this term might not be so limited in the initial application (which, tellingly, also asked about suits), such limitation makes sense with reference to a renewal application. This is especially so given the omission of any reference to suits.[3]

---

[3] I, of course, construe ambiguity against the plaintiff.

## 5. Number of Accountants and Accounting Professionals

Each application asked:

STAFF CLASSIFICATION (include owners, partners, officers and accounting professionals only for each category). Check "no change" if your staff classification remains the same as last year.

                                  PREVIOUS    CURRENT    NO CHANGE

CPA's [sic]

Non-CPA (full time)
Accounting Professionals

Non-CPA (part time)
Accounting Professionals

The parties dispute whether Capwill's answers, which indicated that the covered firms employed three such individuals and that the number had not changed from year to year, were correct. This depends on the duties of persons whom the record describes as "bookkeepers."

At this point, the evidence about those duties is in dispute. That being so, I can make no definitive determination as to the truth or falsity of Capwill's answers.

## 6. Finding of Fraudulent Intent

Capwill knew what he was doing in his dealings with plaintiff: applying for malpractice insurance. The questions plaintiff asked him on each application were clear and straightforward, demanding equally clear and straightforward answers. There can be no doubt that his answers were, in part, untruthful, or that they were deliberately so. The only explanation for his falsehoods is that he intended to deceive the plaintiff into issuing policies it might otherwise not have issued had he answered truthfully.

A rational fact finder could only conclude that Capwill acted with intent to defraud.

### B. Waiver/Laches

### 1. Waiver

Defendant asserts that the related doctrines of equitable estoppel, acquiescence and waiver bar plaintiff's claims.

Equitable estoppel results when a party acts in a manner that is inconsistent with a position that the party later asserts. *E.g., Horton v. Ford Motor Co.*, 427 F.3d 382, 388 (6th Cir. 2005) (citing *Heckler v. Comm. Health Service of Crawford County, Inc.*., 467 U.S. 51 (1984)). In Ohio, to prevail on a claim of equitable estoppel, a party must prove: 1) the opposing party made a factual misrepresentation, 2) it was a misleading misrepresentation, 3) it induced actual reliance that was reasonable and in good faith, and 4) it caused detriment to the relying party. *E.g., Doe v. Blue Cross/Blue Shield of Ohio*, 79 Ohio App.3d 369, 379 (1992).

The receiver also claims that plaintiff acquiesced in Capwill's fraudulent misstatements when it undertook to renew for ninety days to enable it to cancel the contract. As stated in *Holmes v. Hrobon*, 93 Ohio App. 1, 45-46 (1952) (citations omitted):

> There is a distinction between estoppel [and] acquiescence. . . . The substance of estoppel is the inducement of another to act to his prejudice; acquiescence embraces all the elements of estoppel and assent to the act or conduct with full knowledge[.]
> \* \* \* \* \*
> The distinguishing feature of acquiescence is that the party against whom it is asserted affirms or approves the transaction at the time it is done. Acquiescence does not arise by merely neglecting to assert his rights. . . . "[A]cquiescence, as the term is used in connection with estoppel, means something more than merely neglecting to assert one's rights. There must be joined with it, before it will operate to deprive a person of his legal rights, all the essential elements of an estoppel". . .

Finally, with regard to the receiver's tri-partite contentions, waiver is a voluntary relinquishment of a known legal right. *Martin Marietta Magnesia Specialties, L.L.C. v. Pub. Util. Comm*. 129 Ohio St.3d 485, 494 (2011).

16

One or more doctrines, the receiver argues, bars plaintiff's ability to recover on its rescission claim. Instead of renewing the policy, albeit intending to cancel it, so that it could give ninety day notice of cancellation, the receiver appears to contend , plaintiff should simply not have renewed it. He claims to have been harmed by the receiver's retention of the renewal premiums.

Regardless, with regard to estoppel and acquiescence, the receiver does not contend, except in a conclusory way, that his predecessor receiver relied in any way whatsoever on the renewal and its contemporaneous notice of cancellation. Nor could he plausibly do so: under no circumstance could an insured who engaged in the conduct in which Capwill had engaged reasonably anticipate that a malpractice carrier would carry him as an insured for a moment longer than necessary.

Likewise, the circumstances of the short-term, single purpose renewal manifest no intent to relinquish any rights under the policy or law. There is simply no basis in the record for concluding that the plaintiff contemplated the possibility of a right of rescission: its focus was entirely on cancelling the contract and contesting coverage. There was much that was not known about what Capwill had done and its possible consequences.

Most simply put: in circumstances such as these, equity will not penalize a party for having sought diligently and promptly to protect its rights where that party, though having headed in one direction, concludes as events unfold and facts reveal themselves that another path is more advantageous. To do otherwise would give the receiver a windfall to which he has not shown he is entitled.

### 2. Laches

Laches is the "negligent and unintentional failure to protect one's rights." *Elvis Presley Enter., Inc. v. Elvisly Yours, Inc*., 936 F.2d 889, 894 (6th Cir.1991). The elements of a laches

17

defense are: "(1) lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting it." *Nartron Corp. v. STMicroelectronics, Inc.* 305 F.3d 397, 408 (6th Cir.2002). In the Sixth Circuit, "there is a strong presumption that a plaintiff's delay in asserting its rights is reasonable as long as an analogous state statute of limitations has not elapsed." *Elvis Presley, supra*, 936 F.2d at 894.

In this case, the applicable statute of limitations is four years. *Seitz v. Stevenson*, 1998 WL 328413, *6 (Ohio App.); *see also Berry v. Javitch, Block & Rathbone*, *L.L.P.*, 127 Ohio St.3d 480, 488 n.1 (2010) (Froehlich, J., dissenting) (dictum).

This disposes of the receiver's laches defense.

To the extent that the receiver could nonetheless prevail on a showing of putative prejudice (which, in light of *Natron*, he cannot), he provides no basis for his contention that plaintiff deliberately waited until seven years had lapsed between the initial application and asserting its rescission claim. He claims that period is significant because of document retention policies permitting disposition of documents after seven years.

Even if there were some basis for his speculation about mal-motivated timing, he has not shown any likelihood of prejudice. The receiver claims prejudice on the basis that, due to loss of documents and faded memories, he cannot develop facts and circumstances about Capwill's false answers.

I disagree: the simple truth is that, with regard to the two dispositive lies, the evidence is indisputable that Capwill lied. There is no dispute about his investment activities – concealment of which a rational fact-finder could only conclude was deliberate and done with fraudulent intent. Nor is there any dispute about the fact of his license revocation. Here, too, no rational

fact-finder could reach any conclusion other than he had an intent to defraud when he did not disclose that incident.

To the extent that the receiver complains about plaintiff's intervening assertion of additional grounds for rescission, his complaints are unavailing. What matters is that plaintiff asserted the claim in a timely manner. The fact that extensive discovery has uncovered additional grounds does not affect its ability to maintain the claim.

With regard to any problems created by the passage of time in uncovering evidence of materiality, all such evidence, whether available or not, is irrelevant. This is so because, and I have concluded above, it is for the insurer, not the receiver, to decide what is material. As a matter of law in Ohio, the questions themselves satisfy any materiality requirement.

There is no merit to the laches defense.

## Conclusion

Capwill lied when he applied for insurance with the plaintiff. He persisted in his falsehoods when he applied for renewal. His motive and intent when he did so are manifest. The questions he fraudulently answered were material to the plaintiff's decision to issue and then renew the policies, and the pricing thereof. There can be no question that, had plaintiff been told the truth, it would not have accepted the applications. Its entitlement to rescission is clear.

Neither laches nor doctrines of estoppel, acquiescence or waiver bar the right to rescind.

It is, therefore,

ORDERED THAT: plaintiff's motion for summary judgment (Doc. 376) be, and the same hereby is granted and defendants' motion for summary judgment (Doc. 356) be, and the same hereby is denied.

The Clerk shall enter judgment accordingly.

So ordered.

>/s/ James G. Carr
>Sr. United States District Judge